# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Baljinder Sandhu and Glow
Hospitality, LLC,

                Plaintiffs,

      v.

Jay L. Kanzler, Jr. and Witzel, Kanzler
& Dimmitt, LLC,

                Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 16-3066 ADM/LIB

_____

Boris Parker, Esq., and Jordan Anderson, Esq., Parker & Wenner, Minneapolis, MN, on behalf
of Plaintiffs.

Ronald H. McLean, Esq., Serkland Law Firm, Fargo, ND, on behalf of Defendants.

_____

## I. INTRODUCTION

On June 7, 2018, the undersigned United States District Judge heard oral argument on

defendants Jay L. Kanzler, Jr. ("Kanzler") and Witzel, Kanzler & Dimmitt, LLC (collectively,

"Defendants") Motion for Summary Judgment [Docket No. 40]. Plaintiffs Baljinder Sandhu

("Sandhu") and Glow Hospitality, LLC ("Glow" or the "Company") (collectively, "Plaintiffs")

oppose the Motion. For the reasons set forth below, Defendants' Motion for Summary Judgment

is granted.

## II. BACKGROUND

### A. Glow Hospitality

In January 2007, Sandhu and Shivcharan Singh ("Singh") discussed investing in hotels.

Second McLean Decl. [Docket No. 44] Ex. B ("Sandhu Dep.") 12:4–12. In June 2007, Sandhu

agreed to provide Singh $300,000 in exchange for a 70% interest in a Holiday Inn Express (the

"Hotel") in Bemidji, Minnesota.  Id. 29:1–19.  Around this time, Singh informed Sandhu that a third partner was needed to complete the Hotel purchase.  Anderson Aff. [Docket No. 47] Ex. A ("Sandhu Aff.") ¶ 28.

Harkrishan Khatkar ("Harry"), was to be the third partner.  Id.  Singh told Sandhu that when the Hotel was purchased, Sandhu would retain a 70% ownership interest and Harry and Singh would each receive 15%.  Id.  Sandhu agreed to the proposed terms, and on June 16, 2007, he began transferring funds to Singh for the Hotel purchase and the franchise fee required by Holiday Inn Express.[1]  Id. ¶ 29.

Around this time, Harry's brother, Devindar Khatkar ("Devindar"), became involved in the transaction.  Id. In September 2007, Singh introduced Harry and Devindar to Kanzler of Witzel, Kanzler, & Dimmitt, LLC ("WKD"), an attorney specializing in real estate transactions. Second McLean Decl. Ex. A ("First Kanzler Dep.") 33:13–21; Kanzler Decl. [Docket No. 43] ¶¶ 3, 5. On September 20, 2007, Harry and Devindar retained Kanzler to create Glow, which would own and operate the Hotel.  Anderson Aff. Ex. E.  In the engagement letter, Kanzler, on behalf of the WKD law firm, stated that Harry and Devindar were the clients and that Glow would become a client when it was created.  Id.  During this time, Kanzler understood that Harry, Devindar, and Singh were part of a group that was working to purchase the Hotel.  First Kanzler Dep. 57:19–21.  Kanzler testified that Singh had some authority to act on behalf of Harry and Devindar, and that Singh had authority to assist in the transactions.  First Kanzler Dep. 58:7–12. Sandhu was aware that Singh had engaged Kanzler to create Glow.  Sandhu Dep. 37:4–13.

_____

[1] The funds were transferred from an account of North East Property, LLC.  Sandhu and Singh held ownership interests in this entity.

On October 5, 2007, Glow's Articles of Incorporation were filed with the Minnesota Secretary of State, and an Operating Agreement was signed.  Anderson Aff. Exs. E, G.  The Articles of Incorporation provide that Harry and Devindar are the sole organizers, and the Operating Agreement lists Harry and Devindar as Glow's sole members, with each owning 50% of the Company.  Id.

On December 3, 2007, Singh emailed Kanzler to request amending Glow's Operating Agreement to change Devindar and Harry's ownership percentages to be Devindar 85% and Harry 15%.  Id. Ex. H.  Kanzler supplied Singh with a modified Operating Agreement reflecting this ownership change.  Id. Ex. I.  Sandhu received a copy of this Operating Agreement.  Sandhu Dep. 41:5–19.

On December 4, 2007, Sandhu emailed Kanzler with escrow information for the upcoming Hotel purchase.  Anderson Aff. Ex. J.  Two days later, Sandhu transferred $198,500 to Glow for the down payment for the Hotel.  Sandhu Aff. ¶ 30.

**B.  The Hotel is Purchased**

Kanzler, Harry, and Devindar attended the January 10, 2008 closing for the Hotel.  Kanzler Decl. ¶ 9.  At this time, Glow was represented to the lenders and to the Holiday Inn Franchisor as being equally owned by Harry and Devindar.  Id. ¶ 11; First Kanzler Dep. 260:22–261:3.  At the closing, the following documents were executed using the identity of Glow:  1) a mortgage with Praireland Economic Development Corporation; 2) a construction mortgage with Zions First National Bank; 3) a mortgage and security agreement with Valuexpress, LLC; and 4) a combination mortgage, security agreement, fixture financing statement and assignment of leases and rents with Timm & Associates, Inc.  Second McLean

Decl. Ex. G. Sandhu was not identified as a member or owner of Glow on any of these documents.

After the closing, Sandhu contacted Singh asking for documentation of his 70% ownership in the Hotel. Sandhu Aff. ¶ 35. Sandhu testified that in the fall of 2007, he spoke with Kanzler, Singh and Harry on conference calls about his ownership interest. Sandhu Dep. 100:12–17. Kanzler denies speaking with Sandhu about an ownership interest in Glow. Anderson Aff. Ex. D ("Second Kanzler Dep.") 17–21:18–16. No documents were executed at this time to memorialize any ownership interest of Sandhu.

On January 15, 2008, Glow executed a Change of Ownership License Agreement and Guaranty for the Holiday Inn Express Franchise with Holiday Hospitality Franchising, Inc. Notice Removal [Docket No. 3-2] Ex. G. This document reflects that 85% of Glow is owned by Devindar and the remaining 15% is owned by Harry. Id. at 34. This mirrors the ownership interests set forth in the Amended Operating Agreement. About this time, the Hotel began operating without Kanzler having any further involvement. Kanzler Decl. ¶ 14.

## C. Glow's Corporate Documents are Modified

In November 2008, Kanzler testified that Singh directed him to again change the ownership structure of Glow. First Kanzler Dep. 141:7–10. Singh asked Kanzler to modify the ownership interests to reflect that Singh owned 49%, Harry 48%, and Devindar 3%. Kanzler Decl. ¶ 15. On November 4, 2008, Kanzler sent Singh an email with an Amended Operating Agreement and a Membership Interest Assignment and Assumption Agreement reflecting the

new ownership percentages.[2]  Anderson Aff. Ex. T; Notice Removal Exs. H, I.  Kanzler did not

speak directly to Devindar about his ownership reduction.  Second Kanzler Dep. 103:4–7.

Rather, Kanzler stated his practice was to send documents to Singh who would secure the proper

signatures and return them to Kanzler.  First Kanzler Dep. 145:17–20.

## D.  Sandhu's Ownership Interest

On December 16, 2009, Sandhu, Harry, and Singh signed a document which reads:

> Baljinder Singh Sandhu put $298,000 to buy Holiday Inn Express
> Bemidji, MN in Jan 2008 and his share is based on his contribution
> in down payment. It is 40%.  Shiv [Singh] is managing the property,
> therefore I (Harkrishan) and Shiv has [sic] no intention to be unjust
> and keep hidden agenda from Baljinder Sandhu.

Anderson Aff. Ex. X.  Kanzler was not present when this document was signed, and Sandhu did

not send it to Kanzler.  Sandhu Dep. 126:13–16.

Glow's 2009 tax filings show that Sandhu owns 40%, Harry owns 15%, and Ajmer Singh

owns 45%.  Anderson Aff. Ex. Y.  It is unclear who Ajmer Singh is.  Although Kanzler did not

prepare Glow's tax filings, he testified that he discussed Sandhu's 40% interest with his clients,

Harry and Singh.  First Kanzler Dep. 161:5–13.  It is unclear exactly when Kanzler discussed

this document with Harry and Singh, but it occurred after December 12, 2010.

---

[2] Sandhu alleges there is uncertainty whether these documents were drafted and modified in November 2008 or September 2010.  Document metadata purportedly shows that the Membership Interest Assignment and Assumption Agreement was created on November 4, 2008, and shows that Devindar owns 85% and Harry 15% of Glow.  Anderson Aff. Ex. U.  By contrast, the Membership Interest Assignment and Assumption Agreement shows that Singh owns 49%, Harry 48%, and Devindar 3% of Glow.  Id. Ex. V.  Kanzler disputes Sandhu's assertion that the documents may have been modified in 2010.  Kanzler claims the purported September 2010 modification was a result of the document being sent in 2010 to a banker at First National Bank of Bemidji.  Kanzler Decl. ¶ 16.

## E.  Events in California

In 2010, Singh and Glow were named as defendants in a lawsuit in California.  In the course of that litigation, Singh signed and filed a declaration stating that he was "employed as a management consultant by Glow on an as needed basis," and that "Glow is the owner and operator of a Holiday Inn Express in Bemidiji [sic], Minnesota."  Anderson Aff. Ex. Z.  Singh averred that "I am not a member or owner of Glow."  Id.  Kanzler denies knowledge of, or involvement in, this California litigation or Singh's declaration.  Kanzler Decl. ¶ 20.

Singh was deposed on September 9, 2010.  At the time of his deposition, Singh stated that Harry and Devindar were the only owners of Glow.  Second McLean Decl. Ex. N at 14:17–21; 17:10–12.  Singh later corrected his deposition testimony and changed his answer to state that "[a]t the time of the sale of the hotel that is the subject of this lawsuit in July, 2008, I was not a member or owner of Glow Hospitality.  I did not acquire any ownership interest in Glow Hospitality until November 5, 2008."  Id. Ex. O.

On June 21, 2010, Harry filed for bankruptcy in the Eastern District of California.  Anderson Aff. Ex. AA.  In his bankruptcy petition, Harry claimed a 15% ownership interest in Glow, which he valued at $481,500.  Id.  In an August 24, 2010 declaration, Harry stated that he and Devindar are the two members of Glow, and that Singh helps out with some business affairs as needed.  Id. Ex. BB.  Kanzler denied having any knowledge of, or involvement in, Harry's bankruptcy or his declaration.  Kanzler Decl. ¶ 20.

In September 2010, Sandhu, Singh, Harry, Kanzler, and investors in other hotels met in California.  Sandhu Dep. 153:17–154:9.  At this meeting, Sandhu claims he and other investors accused Singh and Harry of diverting funds and defrauding investors.  Id. 154:11–155:3.  Sandhu

testified that he spoke individually with Kanzler about his concerns.  Id. 155:4–9; 14–21.

## F.  Glow's Bank Accounts

After the California meeting, Sandhu sought to transfer Glow's deposit accounts at First National Bank of Bemidji ("First National") to new accounts at the same bank to prevent Singh and Harry from diverting funds away from Glow.  Id. 164:5–9.  First National then froze the Glow account.  First National requested opinion letters from counsel for Glow and Sandhu concerning Glow's ownership.  Id. 165:22–166:1; 167:17–168:8.

Sandhu retained attorney Greg Gilbert ("Gilbert") to represent him and Devindar. Kanzler became aware of the frozen accounts on September 22, 2010, when he spoke to Gilbert. Kanzler Decl. ¶ 21.  Kanzler provided Gilbert with copies of the 2008 Amended Operating Agreement that showed Singh owned 49%, Harry 48%, and Devindar 3% of Glow.  Id.; Second McLean Decl. Ex. Q.

On September 22, 2010, Kanzler sent an email to Singh reporting his conversation with Gilbert.  Anderson Aff. Ex. DD.  Kanzler stated that Gilbert "did not know about the amendments that occurred in November 2008, and was quite surprised to hear that Devindar only owned 3% of the company.  Obviously, given this change of facts, I would be very, very surprised if he continued to push forward with anything on behalf of Devindar."  Id.

Also on September 22, 2010, Harry faxed a Corporate Resolution by Unanimous Consent to First National.[3]  Id. Ex. GG.  The Corporate Resolution by Unanimous Consent, which is signed by Harry and Devindar, states that Devindar and Harry are "all of the Members of Glow,"

---

[3] In their brief, Plaintiffs claim that Kanzler sent this document to Singh, who then sent the signed copy to First National.  Mem. Opp'n [Docket No. 46] 16–17.  There is no documentary evidence in the record to support this assertion.

and it operates to 1) remove Sandhu and Singh as authorized signators on Glow's accounts, and 2) establish Harry as Glow's sole authorized signator for its accounts at First National. Id. Ex. GG. After receiving this Corporate Resolution from Harry, First National faxed it to Gilbert. Id.

On September 24, 2010, Kanzler wrote First National. Id. Ex. MM. Kanzler's letter states that: 1) WKD represents Glow; 2) Kanzler drafted Glow's corporate documents and provided legal assistance relating to the Hotel purchase and other corporate matters; and 3) Singh owns 49%, Harry owns 48%, and Devindar owns 3% of Glow. Id. Kanzler stated that he reached this conclusion after speaking with Singh and Harry, speaking with counsel for Devindar, reviewing Glow's corporate governance documents and the sworn declarations of Singh and Harry, and reviewing documents previously executed by Devindar. Id. Kanzler attached copies of the Membership Interest and Assignment Agreement, Corporate Resolution by Unanimous Consent, and the November 5, 2008 Amended Operating Agreement to his letter.

On September 27, 2010, Gilbert wrote First National and provided his opinion of Glow's ownership. Id. Ex. NN. Gilbert stated that in his opinion, Glow was 85% owned by Devindar and 15% owned by Harry. Id. Gilbert stated that his opinion was based upon, among other things, a review of Glow's corporate documents and the affidavits of Singh and Harry. Id. Gilbert wrote that he also considered: 1) Devindar's purported signatures on the September 22, 2010 Corporate Resolution by Unanimous Consent and Corporate Resolution to be forged; 2) discussions with Kanzler where he indicated that he did not receive executed copies of the November 2008 documents until they were faxed to him on September 22, 2010; and 3) Devindar's denial that he signed the November 2008 documents or the Corporate Resolution by Unanimous Consent. Id.

First National responded to Gilbert's letter the following day. First National President Thomas E. Welle ("Welle") wrote that Kanzler was the more appropriate authority to express an opinion on ownership of Glow based on his experience with the Company. Second McLean Decl. Ex. S. Welle stated that the bank considered the September 24, 2010, Corporate Resolution by Unanimous Consent to be an appropriate exercise of Glow's majority owners' authority. Id.

On October 21, 2010, Gilbert wrote Kanzler. Anderson Aff. Ex. PP. Gilbert stated that First National had relied upon Kanzler's opinion that Glow was 49% owned by Singh, 48% owned by Harry, and 3% owned by Devindar. Id. Gilbert charged Singh and Harry as having "no regard for telling the truth" about Glow's true ownership. Id. Gilbert continued that

> [w]hile there may have been a basis for your opinion originally, it is no longer ethical for you to blindly stand by representations from your clients which you know to be false in support of an opinion about company ownership. Based on recent information, you have an affirmative duty to go back to your clients and check out the veracity of their claims and update your opinion.

Id. Kanzler did not modify his opinion as expressed in his letter to First National on September 24, 2010.

## G. Litigation in Minnesota State Court

On December 12, 2010, Sandhu and Devindar filed suit in Minnesota state court against Glow, Harry, Singh, and GIO Management, Inc. ("GIO"), a company owned by Singh. First McLean Decl. [Docket No. 33] Ex. A ("State Court Compl."). The complaint alleges that Singh and Harry made illegal distributions of corporate funds and asserts claims for fraud, breach of contract, and breach of fiduciary duties, and sought inspection of corporate records and a demand for the fair value of membership interests. Id. The complaint additionally sought

appointment of a receiver.  Id.  Defendants retained attorney Darrell Carter ("Carter") to represent them.  Kanzler Decl. ¶ 23.

On December 20, 2010, the court held a hearing on plaintiffs' request to appoint a receiver.  The following day, Kanzler submitted an affidavit in which he stated that he is outside counsel to Glow, and that he represents Harry, and Singh.  Notice Removal Ex. T.  Kanzler stated that Sandhu "does not now, nor has he ever had, an investment interest in [Glow].  I am unaware of any documents that might support such a claim."  Id.  Kanzler accused Sandhu and Devindar of again attempting to wrest control of Glow from Singh and Harry, citing the September 2010 account issue with First National as a previous attempt.  Id.  Finally, Kanzler stated the Hotel was operating at a profit, is solvent and paying its bills on time as support that no receiver need be appointed.  Id.

On January 4, 2011, the motion to appoint a receiver was denied.  Anderson Aff. Ex. 1.

**H.  Financial Trouble for the Hotel**

On November 19, 2010, InterContinental Hotels Group ("IHG"), the hospitality company that owns Holiday Inn Express, declared that Glow was in default of its License Agreement. Notice Removal Ex. W.  On December 22, 2010, Prairieland Economic Development Corporation declared Glow delinquent on its January 10, 2008 promissary note.  Id. Ex. W.  And in a January 21, 2011 letter, Zions Bank declared Glow in default of its loan.  Id. Ex. U.

Glow's apparent financial problems did not last long.  On February 16, 2011, IHG wrote Glow and stated that its financial default had been cured.  Id. Ex. X.  On March 8, 2011, Zions Bank and Glow, Harry, and Devindar entered into a Forbearance Agreement, whereby Zions Bank agreed to temporarily refrain from accelerating the note and exercise its foreclosure option

so as to allow Glow, Harry, and Devindar an opportunity to cure the default.  Id. Ex. V.

## I.  Devindar Reaches Settlement

On or about March 8, 2011, Devindar was negotiating a settlement with Glow, Singh, and Harry in the pending state court lawsuit.  Anderson Aff. Ex. SS.  In an October 31, 2011 email from Singh to Kanzler, Singh stated that the Devindar "settlement is done."  Id. Ex. VV.  The agreement called for Devindar's 3% interest in Glow to be purchased for $60,000.  Id.  Kanzler testified that this was a transfer of ownership, not a settlement of any legal claims.  Second Kanzler Dep. 89:2–5.  Kanzler billed Glow 3.5 hours for "Draft Settlement Agreement."  Anderson Aff. Ex. TT.

Prior to the settlement with Devindar, on August 31, 2011, Kanzler was disqualified from acting as counsel for Glow, Harry, and Singh because he could be called as a fact witness.  Id. Ex. 2.  Carter remained as counsel for the defendants in the state court suit.

## J.  Receiver is Appointed and Defendants Default

On January 26, 2012, one day before the hearing on Sandhu's[4] second Motion to Appoint a Receiver and Award Sanctions, Carter filed an affidavit of Kanzler.  Notice Removal Ex. Y.  In the affidavit, Kanzler restated his knowledge of Glow's corporate records, what occurred at the closing for the Hotel purchase, and Glow's financial condition.  Id.  Kanzler again stated that "Sandhu has never had an ownership interest in Glow."  Id.

Plaintiffs allege that Kanzler made a number of knowingly false statements in his affidavit, including that 1) the only persons who invested money in Glow were Harry and Singh; 2) Sandhu was not a party to any of the loan documents; 3) Sandhu was never mentioned as

---

[4] Devindar exited the litigation after the October 31, 2011 settlement agreement.

being a member of Glow before the closing for the Hotel purchase; and 4) Glow was current in its accounts payable.

On March 19, 2012, Carter wrote Kanzler expressing concern over documents he had recently received from Sandhu and his counsel. Anderson Aff. Ex. XX. In the letter, Carter was troubled by the December 16, 2009 document signed by Singh and Harry recognizing Sandhu's $290,000 contribution as evidence that Sandhu had invested and had an ownership interest in Glow. Id. Carter was also concerned about Singh's deposition statements denying any ownership interest in Glow. Id.

Kanzler responded that "[t]his is more non-sense." Id. Ex. YY. Kanzler stated that every transaction can be explained, and that Sandhu, as a non-member of Glow, does not have any right to an accounting of the Company. Id.

On April 30, 2012, the state court appointed a receiver for Glow. Id. Ex. 3.

After a receiver was appointed, Singh, Harry, and Glow failed to defend the lawsuit. On June 25, 2012, default judgment in favor of Sandhu was entered. Anderson Aff. Ex. 4. Sandhu was awarded a 70% interest in Glow. Id. On October 31, 2012, Sandhu was awarded $1,215,940.25 in damages against Singh, Harry, and GIO. Id. Ex. 5.

**K.  Present Lawsuit**

The present lawsuit was filed in Beltrami County on August 16, 2016, and removed to federal court on September 14, 2016. It asserts five claims against Kanzler and WKD. In Counts I and II, Glow alleges breach of fiduciary duty claims against Kanzler and WKD. Counts III and IV are fraud claims asserted by Sandhu against Kanzler, and Count V is a vicarious liability claim asserted against WKD.

Defendants move for summary judgment on all counts.

## III.  DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, the nonmoving party "may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  Davenport v. Univ. of Ark. Bd. of Trs., 553 F.3d 1110, 1113 (8th Cir. 2009) (citing Anderson, 477 U.S. at 247–49).

Defendants raise three arguments in support of their Motion for Summary Judgment:  1) all claims are barred by the statute of limitations; 2) all claims are actually, or derivative of, claims for legal malpractice subject to expert affidavits that Plaintiffs failed to submit; and 3) all claims fail to raise a genuine issue of material fact.

### B.  Statute of Limitations

The parties agree that all claims asserted here are subject to a six year statute of limitations.  Since this lawsuit was filed on August 16, 2016, any claims that accrued prior to August 16, 2010 are untimely.

Defendants argue that the genesis of Plaintiffs claims occurred outside of the limitations period and thus the claims are untimely. Plaintiffs disagree. They assert that although the breach of Kanzler's and WKD's fiduciary duties and fraudulent activities began outside the limitations period, they continued to occur within the limitations period and are thus timely.[5] Although not explicitly stated, Plaintiffs seemingly suggest that the continuing violation doctrine applies to allow actions to survive that would otherwise be barred by the statute of limitations.

"Generally, a claim accrues and the statute of limitations begins to run on the date the injured party suffers some damage that is sufficient to survive or successfully defend against a motion to dismiss." Oganov v. Am. Family Ins. Grp., 767 N.W.2d 21, 24 (Minn. 2009). An exception to this rule is the continuing violation doctrine, which arises when the unlawful activities manifest themselves over time, rather than as a series of discrete acts. Kalia v. St. Cloud State Univ., 539 N.W.2d 828, 834 (Minn. Ct. App. 1995). "In such circumstances, '[c]ontinuing violations can prevent the expiration of the statute of limitations.'" Citizens for a Safe Grant v. Lone Oak Sportsmen's Club, Inc., 624 N.W.2d 796, 803 (Minn. Ct. App. 2001).

The continuing violation doctrine is most commonly applied in discrimination cases. Although it has been extended into other areas of law, it has not been extended to cover financially based claims such as Plaintiffs assert here. Davies v. West Pub. Co., 622 N.W.2d 836, 841–42 (Minn. Ct. App. 2001). Thus, only those discrete acts that began accruing after

---

[5] Plaintiffs are inconsistent on this point. On one hand, Plaintiffs argue, for example, that in 2008 Kanzler knew but did not remedy that Glow was structured to deprive Sandhu of his ownership interest. Pls. Mem. Opp'n Summ. J. at 38. On the other hand, Plaintiffs state that "Kanzler's breaches of fiduciary duties, his fraud, and his collusion and assistance in the breaches of fiduciary duties began, and first accrued as a cause of action against Kanzler related to his representations to the bank about the ownership of Glow in September, 2010." Id. at 44.

August 16, 2010, are timely.

Since Plaintiffs assert that discrete acts taken after August 16, 2010 support each claim, the statute of limitations does not end this case. Therefore, in considering Plaintiffs' claims, only those discrete acts that occurred after August 16, 2010 will be considered in assessing the viability of each claim. However, the Court will not blind itself to events that occurred earlier. Acts and events that occurred prior to August 16, 2010, while not independently actionable, may provide context to acts that occurred within the limitations period. Therefore, the statute of limitations narrows, but does not eliminate altogether, consideration of the evidence that gives rise to Plaintiffs' claims.

## C. Expert Witness Affidavit and Disclosure Requirements

Defendants argue that Plaintiffs' claims must be construed as, or derivative of, legal malpractice claims subject to the expert witness requirements of Minn. Stat. § 544.42. Since Plaintiffs failed to either submit an expert witness affidavit or disclose an expert witness, as § 544.42 demands, Defendants argue that the Complaint must be dismissed. Plaintiffs respond that the claims here are based entirely on intentional, rather than negligent, actions. Plaintiffs contend that because intentional acts do not require Plaintiffs to prove deviation from an established standard of care, the expert witness requirements of § 544.42 do not apply.

Minn. Stat. § 544.42, subd. 2 provides

> In an action against a professional alleging negligence or malpractice in rendering a professional service where expert testimony is to be used by a party to establish a prima facie case, the party must:
>
> (1) . . . serve upon the opponent with the pleadings an affidavit as provided in subdivision 3; and
>
> (2) serve upon the opponent within 180 days of commencement of

discovery . . . an affidavit as provided in subdivision 4.

The affidavit required by Minn. Stat. § 544.42, subd. 2(1) is an affidavit that states that the accusing attorney has reviewed the facts of the case "with an expert whose qualifications provide a reasonable expectation that the expert's opinions could be admissible at trial and that, in the opinion of this expert, the defendant deviated from the applicable standard of care and by that action caused injury to the plaintiff." Id. subd. 3. The affidavit required by Minn Stat. § 544.42, subd. 2(2) is an affidavit signed by the party's attorney that identifies any experts that the attorney expects to call as an expert witness at trial and states the substance of each expert's testimony and a summary of the grounds for each of the expert's opinions. Id. subd. 4. Failure to comply with either § 544.42, subd. (2)(1) or (2)(2) requires dismissal of each cause of action which depends upon expert testimony to establish a prima facie case.[6] Id. subd. 6(a), (c).

Although Minn. Stat. § 544.42, subd. 2 appears to limit the affidavit requirements to actions alleging "negligence or malpractice in rendering a professional service," courts have routinely held that causes of action derivative of legal malpractice claims must also abide by the requirements of § 544.42. For example, in Pearson v. Oxford Property Advisors, LLC, claims alleged against an attorney and his law firm for breach of fiduciary duty, aiding and abetting tortious conduct, fraud and misrepresentation, and civil conspiracy were subject to the requirements of § 544.42. No. A10-1766, 2011 WL 1833133, at *5 (Minn. Ct. App. May 16,

---

[6] There is a safe harbor that requires a court to issue specific findings concerning deficiencies in the affidavit of expert disclosure and give the nonmoving party 60 days to cure. Minn. Stat. § 544.42, subd. 6(c). This safe harbor does not apply unless the plaintiff timely served an affidavit that at least nominally satisfies the statute. In other words, the safe harbor does not apply when the plaintiff served no affidavit at all, which is what occurred here.

2011) (unpublished).[7]  Similarly, in <u>Club Vista Financial Services, L.L.C. v. Maslon, Edelman, Borman & Brand, LLP</u>, fiduciary duty claims stemming from an attorney-client relationship were derivative of legal malpractice claims and thus subject to § 544.42.  No. 10-3174, 2011 WL 4947629, at *14–15 (D. Minn. Oct. 18, 2011).

In this case, Plaintiffs have not alleged a claim stated to be a legal malpractice claim against Kanzler or WKD.  Instead, the causes of action are styled as breach of fiduciary duty, fraud, reckless misrepresentation/omission, collusion/aiding and abetting, and vicarious liability. Compl. ¶¶ 77–126.  As explained in <u>Pearson</u> and <u>Club Vista</u>, however, such claims may still be subject to Minn. Stat. § 544.42.

Counts I and II allege claims against Kanzler and WKD on behalf of Glow, a former client of Kanzler and WKD.  Thus, these Counts are potentially subject to § 544.42.  Counts III and IV are alleged by Sandhu, who has not had an attorney-client relationship with either Kanzler or WKD.  Thus, Counts III and IV cannot be considered derivative of an attorney malpractice claim.  Since Count V is alleged against WKD by Sandhu and Glow, only Glow's claim against WKD is potentially subject to § 544.42.

### 1.  Count I - Breach of Fiduciary Duty:  Conflict of Interest

In Count I of the Complaint, Glow alleges a breach of fiduciary duty claim against Kanzler and WKD.  The gravamen of this claim is that Defendants engaged in conflicts of interest that placed their own interests above those of their client, Glow.  Examples of the alleged conflicts of interest include:  1) Kanzler denied knowing anything about Sandhu's alleged

---

[7] Unpublished cases are considered persuasive rather than precedential authority.  <u>See</u> <u>City of St. Paul v. Eldredge</u>, 788 N.W.2d 522, 526 (Minn. Ct. App. 2010).

investment in Glow; 2) Kanzler relied upon Singh, Harry, and Glow corporate documents when he submitted affidavits in state court that failed to recognize Sandhu's ownership interest in Glow; and 3) Kanzler knowingly took the position that most benefitted Singh and subsequently damaged Glow.

An attorney owes a fiduciary duty "to represent the client with undivided loyalty, to preserve the client's confidences, and to disclose any material matters bearing upon the representation of these obligations." <u>Rice v. Perl</u>, 320 N.W.2d 407, 410 (Minn. 1982) (quotation omitted). "A claim for breach of fiduciary duty is closely related to a claim of professional negligence and requires a plaintiff to demonstrate a fiduciary duty, breach of that duty, causation, and damages." <u>Wells v. Mattox</u>, No. A15-1771, 2016 WL 3223227, at *5 (Minn. Ct. App. June 13, 2016) (unpublished) (citing <u>Padco, Inc. v. Kinney & Lange</u>, 444 N.W.2d 889, 891 (Minn. Ct. App. 1989)). By applying the holding in <u>Wells</u>, Count I is seemingly subject to the affidavit requirements of Minn. Stat. § 544.42.

Plaintiffs raise two arguments to resist this conclusion. First, Plaintiffs cite <u>Noske v. Friedberg</u>, 713 N.W.2d 866 (Minn. Ct. App. 2006), for the proposition that a breach of fiduciary duty claim is a separate and distinct cause of action from a claim for professional negligence. Plaintiffs argue that this distinction applies here because this claim is premised upon Kanzler's intentional acts done with the purpose to deceive. Section 544.42 demands expert testimony when proving deviation from an established standard of care is a required element of a prima facie case, such as in a negligence action. Plaintiffs argue that because claims premised on intentional acts do not require proving a departure from a standard of care, Count I is not subject to § 544.42.

Plaintiffs' reliance on Noske is unpersuasive. The Noske court explained "Minnesota law recognizes various legal theories of recovery related to attorney misconduct, including intentional fraud and misrepresentation, breach of contract, breach of fiduciary duty, and professional negligence," and that "[c]laims of professional negligence and fraud are separate and distinct." 713 N.W.2d at 875–76. Plaintiffs argue that Noske supports their assertion that a fraud claim premised on intentional acts is independent of a negligence based claim and therefore does not need to be supported with expert testimony. But Noske did not address whether a "separate and distinct" fraud claim arising from the attorney-client relationship nevertheless needed to be supported with expert testimony. Although the plaintiff in Noske initially pleaded claims based on intentional acts, only the professional negligence claim was pursued on appeal. Id. at 876. Thus, Noske did not resolve whether these related but "separate and distinct" claims are nevertheless required to be prosecuted with expert testimony. Wells, on the other hand, focused its analysis on whether expert testimony was needed to prosecute a fiduciary duty and constructive fraud claim.[8] 2016 WL 3223227, at *5. In holding that expert testimony was required, Wells stated that "[a] claim for breach of fiduciary duty is closely related to a claim of professional negligence and requires a plaintiff to demonstrate a fiduciary duty, breach of that duty, causation, and damages." Id.

In the instant case, Plaintiffs will also be required to prove that Kanzler breached his duty to his client, Glow. To prove such a breach, Plaintiffs will have to establish the applicable standard of care and how Kanzler deviated from that standard. This is true even though,

---

[8] Wells additionally held that a breach of contract claim required expert testimony. 2016 WL 3223227, at *6.

according to Plaintiffs, Kanzler's breach was the result of purposeful conduct done with the intent to deceive.

Plaintiffs' second argument is that expert testimony is not required because "the matters to be proven are within the area of common knowledge and lay comprehension." <u>Hill v. Okay Constr. Co.</u>, 252 N.W.2d 107, 116 (Minn. 1977). This argument is also unpersuasive. <u>Hill</u>, which predated the expert affidavit requirement of § 544.42, was a malpractice case in which "the conduct complained of [could] be evaluated adequately by a jury in the absence of expert testimony." 252 N.W.2d at 116. Later decisions have referred to this as a "rare" exception to the affidavit requirement. <u>Fontaine v. Steen</u>, 759 N.W.2d 672, 677 (Minn. 2009) (quoting <u>Sorenson v. St. Paul Ramsey Med. Ctr.</u>, 457 N.W.2d 188, 191 (Minn. 1990)); <u>see also</u> <u>Meyer v. Dygert</u>, 156 F. Supp. 2d 1081, 1090–91 (D. Minn. 2001) ("[T]he claims involved in this case do not involve an obviously missed deadline or a clear case of stealing client funds. Rather, the claims relate to conflicts of interest, which involved information that is not within the common knowledge of the jury.").

This is not a case where the conduct complained of can be adequately understood by a jury without expert testimony. Determining whether an attorney breached a fiduciary duty to their client is far more complex and nuanced than missing a deadline or stealing client funds. This claim turns on Kanzler's reliance upon the representations made by his clients, Devindar and Harry, and the representations by Singh, who was a documented owner of Kanzler's corporate client, Glow. Additionally, the jury would be asked to decide whether Kanzler was required to investigate Sandhu's fears that Singh and Harry were misappropriating Glow's funds. These considerations are significantly different in kind from the types of events <u>Hill</u> exempted

from the expert testimony requirement. Accordingly, the requirements of Minn. Stat. § 544.42 apply, and summary judgment is granted on Count I.

### 2. Count II - Breach of Fiduciary Duty

In Count II, Glow alleges a breach of fiduciary duty against Kanzler. This claim arises from Minn. Stat. § 481.06, which provides that "Every attorney at law shall . . . employ, for the maintenance of causes codified to the attorney, such means only as are consistent with truth, and never seek to mislead the judges by any artifice or false statement of fact of law." Minn. Stat. § 481.06, subd. (4).

Plaintiffs assert that expert testimony is not required because this cause of action is statutory and not based on negligence. Plaintiffs cite no authority to support this proposition and do not articulate a persuasive reason for why this cause of action should be treated differently from a common law fiduciary duty claim. For the reasons explained above, expert testimony is required. Summary judgment is granted on Count II.

### 3. Count V - Vicarious Liability

In Count V, Sandhu and Glow allege a claim against WKD for the actions taken by Kanzler. As discussed above, since Sandhu never had an attorney-client relationship with Kanzler or WKD, any claim by Sandhu against WKD cannot be derivative of an attorney malpractice claim. However, Glow's vicarious liability claim against WKD falls within the ambit of Minn. Stat. § 544.42. Therefore, any claim Glow may have against WKD that is premised upon Kanzler's liability to Glow is dismissed.

**D. Sufficiency of the Allegations of the Complaint**

    **1. Count III - Fraud, Reckless Misrepresentation/Omission (Actual Fraud)**

    In Count III, Sandhu alleges an "actual fraud" claim against Kanzler. "Sandhu's claim for fraud is based on the disputed facts that Kanzler knew, directed, and oversaw Singh and [Harry's] misappropriation of Sandhu's investment, with the intention of depriving Sandhu of any ownership interest in Glow." Pls.' Mem. Opp'n Summ. J. at 38. Plaintiffs argue that this claim should proceed to trial for two reasons. First, Plaintiffs argue that after learning of Sandhu's concerns about Singh and Harry in September 2010, Kanzler knew that Glow's funds were being misappropriated and Kanzler's failure to act deprived Sandhu of his investment. Second, Plaintiffs argue that Kanzler knew that Singh and Harry had signed a document memorializing Sandhu's $298,000 contribution for 40% ownership interest in Glow, yet he took no action to memorialize Sandhu's ownership interest.[9] Kanzler argues that there is no genuine issue of material fact that Kanzler committed fraud or reckless misrepresentation.

    Fraud may be established by demonstrating the intentional concealment of the truth. U.S. Bank, N.A. v. Cold Spring Granite Co., 802 N.W.2d 363, 373 (Minn. 2011). "If a party conceals a fact material to the transaction, and peculiarly within his own knowledge, knowing that the other party acts on the presumption that no such fact exists, it is as much a fraud as if the existence of such fact were expressly denied, or the reverse of it expressly stated." Richfield Bank & Trust Co. v. Sjogren, 244 N.W.2d 648, 650 (Minn. 1976) (quoting Thomas v. Murphy, 91 N.W. 1097, 1098 (Minn. 1902)).

---

[9] Plaintiffs also assert that Kanzler is liable for structuring Glow in a manner that failed to recognize Sandhu's ownership interest. Since the acts constituting the basis for this claim occurred in 2007, well prior to August 16, 2010, it is barred by the statute of limitations.

There is no evidence in the record that Kanzler knew, directed, or oversaw Singh and Harry's alleged misappropriation of Sandhu's investment. To the contrary, Kanzler had no involvement in the regular course of operations or finances of Glow or the Hotel. Kanzler's role as Glow's attorney was limited to drafting amended corporate documents that were requested and later executed by his clients. Any fraud committed by Singh or Harry was committed without Kanzler's direction or oversight. There is also no evidence that "Kanzler let Sandhu continue to believe that his investment resulted in an ownership of the hotel and a membership of Glow." Pls.' Mem. Opp'n Summ. J. at 39. Sandhu knew that he was not a documented owner of Glow and that he did not personally sign any of the documents to effectuate the Hotel purchase. Despite knowing this, he failed to take the necessary steps to have Glow's Operating Agreement amended to reflect his ownership interest. Kanzler cannot be liable for Sandhu's failure to properly protect his own investment.

At the time of Sandhu and Kanzler's September 2010 meeting in California, Sandhu was neither a client of Kanzler's nor a documented owner of Glow. Kanzler was therefore under no obligation to act upon Sandhu's concerns. Finally, the December 16, 2009, document signed by Sandhu, Singh, and Harry stating that Sandhu invested $298,000 to purchase 40% of the Hotel is not evidence of fraud by Kanzler. Even if Kanzler learned of this document within the limitations period, there is no evidence that this document was ever presented to Kanzler with the directive to modify Glow's corporate documents to reflect Sandhu's ownership interest. Sandhu seeks to hold Kanzler liable for not altering Glow's ownership percentages on his own accord, without any direction or insistence from his clients and the documented owners of the Company. A corporate attorney cannot be liable for failing to take this action under these

circumstances.

In sum, the record does not reflect any evidence that Kanzler thwarted Sandhu's investment in Glow or committed fraud by omitting or misrepresenting the truth about Sandhu's ownership interest.

### 2.  Count IV - Breach of Fiduciary Duty:  Collusion/Aiding and Abetting

In Count IV, Sandhu alleges Kanzler aided and abetted Singh and Harry's fraud by drafting corporate documents and submitting affidavits in the state court litigation that disclaimed any ownership interest Sandhu had in Glow.  Kanzler is liable, according to Sandhu, because he "knowingly participate[d] with his client[s] in the perpetration of a fraudulent or unlawful act."  McDonald v. Stewart, 182 N.W.2d 437, 440 (Minn. 1970).  Kanzler argues that there is no evidence that he aided or abetted any collusion on behalf of Singh and Harry.

Generally, "an attorney acting within the scope of his employment as an attorney is immune from liability to third persons for actions arising out of that professional relationship." Id.  "An exception exists, however, when the attorney acts fraudulently, maliciously, or otherwise commits an intentional tort."  Rucker v. Schmidt, 768 N.W.2d 408, 412 (Minn. Ct. App. 2009) (citing Melrose Floor Co. v. Lechner, 435 N.W.2d 90, 91 (Minn. Ct. App. 1989)); see also Hoppe v. Klapperich, 28 N.W.2d 780, 791 (1947) (stating that an attorney may be liable for knowingly becoming an "instrumentality for the perpetration of fraud").

> A claim for aiding and abetting the tortious conduct of another has three basic elements:
>
> (1) the primary tort-feasor must commit a tort that causes an injury to the plaintiff;
>
> (2) the defendant must know that the primary tort-feasor's conduct constitutes a breach of duty; and

> (3) the defendant must substantially assist or encourage the primary tort-feasor in the achievement of the breach.

<u>Witzman v. Lehrman, Lehrman & Flom</u>, 601 N.W.2d 179, 187 (Minn. 1999) (citing Restatement (Second) Torts § 876(b); <u>Ezzone v. Riccardi</u>, 525 N.W.2d 388, 398 (Iowa 1994)).

There is no evidence that Kanzler substantially assisted or encouraged Singh and Harry to breach their fiduciary duties to Sandhu. As discussed above, Kanzler's involvement with Glow and with Singh and Harry was limited to that of corporate counsel. Separate from the state court litigation, Kanzler's role with Glow was limited to providing his clients unsigned corporate documents that modified the ownership percentages of the Company as his clients requested. These acts fall well short of what is needed to establish an aiding and abetting theory.

With respect to the affidavits filed in the state court case, they too did not substantially assist Singh and Harry's alleged fraud. The information included in the affidavits was based upon Kanzler's personal knowledge of Glow in his role as corporate counsel and also, in part, on directions from his clients, Singh and Harry. Sandhu nevertheless asserts that Kanzler's representations falsely conveyed that Sandhu did not have an ownership interest in the Company. But at the time Kanzler submitted his affidavits, Sandhu was not a documented owner of Glow. As discussed above, Kanzler cannot be liable for Sandhu's failure to protect his investment by ensuring his ownership interest was accurately reflected in Glow's corporate documents.

### 3. Count V - Vicarious Liability

In Count V, Sandhu seeks to hold WKD vicariously liable for the misconduct of Kanzler. Because all claims against Kanzler fail on the merits, WKD cannot be held liable under a vicarious liability theory.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that Defendants Jay L. Kanzler, Jr. and Witzel, Kanzler & Dimmitt, LLC

Motion for Summary Judgment [Docket No. 40] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  August 14, 2018.